CITY OF HARTFORD *v.* BRIAN MCKEEVER ET AL.
(AC 33027)

Gruendel, Sheldon and Schaller, Js.

Argued April 26—officially released November 27, 2012

*Catharine H. Freeman,* assistant corporation counsel, for the appellant (plaintiff).

*Christopher M. Reeves,* for the appellee (named defendant).

*Opinion*

SHELDON, J. The plaintiff, the city of Hartford, appeals from the judgment rendered by the trial court in favor of the defendant Brian McKeever[1] awarding him $195,909 in damages on his counterclaim to recoup moneys overpaid by him to the plaintiff and other prior holders of two notes secured by mortgages on his property in Hartford. The plaintiff claims that the trial court erred in finding that the plaintiff, as the most recent assignee and current holder of the defendant's note, could be held liable to repay the defendant for sums he overpaid on the note, not only to itself but to other prior holders thereof.[2] We agree with the plaintiff and thus reverse the judgment of the trial court.

[1] Webster Bank, Helene Fishman, Trustee, and Metropolitan District were also named as defendants but are not parties to this appeal. We refer in this opinion to Brian McKeever as the defendant.

[2] The plaintiff also claims that the trial court erred in failing to articulate the precise legal basis upon which it made its award of damages under the counterclaim. On October 25, 2011, the court, while granting the plaintiff's motion for articulation, noted that it could not "determine at th[at] time [on] which of the five counts [the defendant] prevailed." Although the court granted the motion for articulation, its inability to respond to the plaintiff's articulation request was the functional equivalent of a denial of the motion. Like a formal denial, the effect of the court's articulation, in which it was unable to explain its decision further, was to foreclose the possibility of meaningful appellate review on the issue unless the plaintiff filed a motion for review. See *Ahneman* v. *Ahneman*, 243 Conn. 471, 480, 706 A.2d 960 (1998).

"Our rules of practice provide a procedure for appellants seeking an articulation from the trial court as to the factual and legal bases for its decisions. Practice Book § 66-5. If the trial judge denies the motion for articulation, the appellant has a remedy by way of motion for review, which may be filed with this court pursuant to Practice Book § 66-7." *Brycki* v. *Brycki*, 91 Conn. App. 579, 593, 881 A.2d 1056 (2005). The plaintiff should have filed a motion for review pursuant to Practice Book § 66-7 when the trial court issued its incomplete articulation. It failed to do so, and, accordingly, we are unable to review the claim.

The plaintiff also claims that the court unreasonably exercised its equitable powers by relying on the defendant's testimony as to the total amount of his overpayment. The plaintiff did not object to or move to preclude the defendant's testimony as to the amount of his overpayment on the basis of his incompetence to so testify. Instead, it sought to attack his credibility on the ground that he was not familiar with generally accepted accounting

The following factual and procedural history is relevant to this appeal. In May, 1983, the defendant owned a building in Hartford, known as 206-208 Hamilton Street (property). The property contained multiple units that the defendant rented to tenants. On May 5, 1983, the defendant borrowed a total of $143,065 in two separate loans from the Community Development Corporation (corporation). In one loan transaction (loan one), the defendant and the corporation entered into a promissory note agreement with a principal amount of $28,879. In the other loan transaction (loan two), the defendant and the corporation entered into a promissory note agreement with a principal amount of $114,186. Each loan was secured by a separate mortgage on the property. At the time they entered into the loan agreements, the defendant and the corporation also entered into a separate agreement, entitled "Collateral Assignment of Leases and Rentals" (assignment of rents agreement), pursuant to which the corporation was empowered to collect rent directly from the defendant's tenants if he defaulted on his obligation to make payments on the notes.

Although the corporation immediately assigned its interest in the notes to Colonial Bank,[3] which later

principles. Although presented as a claim that the court exercised its equitable powers in an unreasonable manner, the plaintiff's claim instead is an attack on the court's credibility determinations. "The credibility of the witnesses and the weight to be accorded to their testimony is for the trier of fact. . . . [An appellate] court does not try issues of fact or pass upon the credibility of witnesses." (Internal quotation marks omitted.) *Wasniewski* v. *Quick & Reilly, Inc.*, 292 Conn. 98, 103, 971 A.2d 8 (2009). We thus conclude that the court did not abuse its discretion in crediting the testimony of the defendant, who relied on properly admitted evidence, Exhibit YY in particular, to establish the total amount of his overpayment.

[3] The court found that "Colonial Bank was acting [in its capacity] as trustee for the [plaintiff] so [the plaintiff] was involved from the beginning." We take issue, however, with other findings set forth in the dissent. The dissent examines the deed of restrictive covenants and makes findings as to the purposes of that deed and the information provided therein. Although the deed was admitted into evidence, the findings as to the contents of the deed to which the dissent refers do not appear in the memorandum of

became State Street Bank & Trust Company of Connecticut (State Street Bank), the corporation continued to service the loans. In July, 2001, State Street Bank assigned loan two to the plaintiff for the sum of one dollar. By that time, the defendant had fully paid loan one, but the plaintiff determined that the defendant had defaulted on his payment obligations as to loan two. Accordingly, in 2003, the plaintiff brought an action against the defendant to foreclose on the property.

On April 21, 2003, the defendant filed a five count counterclaim against the plaintiff, claiming: (1) violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.; (2) violation of the Connecticut Creditors' Collection Practices Act, General Statutes (Rev. to 1993) § 36-243a; (3) breach of the implied covenant of good faith and fair dealing; and (4) breach of a modification agreement previously agreed to by himself and the plaintiff. He also sought, in the fifth count, an accounting as to all payments that his tenants had made under the assignment of rents agreement.[4]

The plaintiff subsequently withdrew its foreclosure complaint, conceding that the defendant had overpaid

decision issued by the trial court. Similarly, the dissent refers to the testimony of Arthur Greenblatt, the principal of the corporation, "that those funds never were furnished to the corporation, nor did the corporation ever lend it any of its own money." The trial court does not cite to this portion of Greenblatt's testimony and we are thus unable to infer that the court credited it or considered it in any way. The trial court also did not reference Greenblatt's testimony that everyone involved in the transactions at issue knew from the beginning that the corporation was never going to use its own money. The only reference by the trial court to Greenblatt's testimony was to the claimed amount of overpayments and his "arrogantly dismissive" attitude. The court further found that Greenblatt's lack of knowledge regarding the corporation's accounting systems "seriously damage[d] the plaintiff's credibility."

[4] The assignment of rents agreement was assignable pursuant to the following provision: "This Assignment shall be binding on the [defendant], and [his] heirs, executors, administrators, successors and assigns and shall inure to the benefit of [the corporation], its successors and assigns."

loan two by \$17,397.93. Accordingly, it offered to compensate him in that amount. The defendant, however, declined the plaintiff's offer, electing instead to proceed to trial on his counterclaim to recover what he claimed to have been an overpayment of \$195,909 on loan two. The plaintiff filed an answer to the counterclaim,[5] denying its essential allegations, and pleaded as a special defense that CUTPA does not apply to municipalities.

After a five day trial, the court issued a memorandum of decision in which it concluded that the plaintiff was liable to the defendant for the total amount he claimed to have overpaid on loan two to the plaintiff and all other prior holders of the note. The court therefore awarded him damages of \$195,909, albeit without specifying the count of the counterclaim under which it made that award. On October 7, 2011,[6] approximately eleven months after the court's November 9, 2010 decision, the plaintiff filed a motion for articulation, requesting for the first time that the court explain, inter alia, under which count of the counterclaim it had found in the defendant's favor. The court responded that, without having access to the court file, it was unable to identify the specific count of the counterclaim under which it had found in the defendant's favor. This appeal followed.

The plaintiff claims that the trial court erred in concluding that, as an assignee, it was liable for the defendant's overpayments, if any, to its assignor, State Street

[5] After trial, the plaintiff attempted to file an amended answer and special defenses, but it was never filed in the court record. Upon learning that the attempted filing was unsuccessful, the plaintiff filed a motion for rectification of the record. The court denied the motion. As a result of this denial, we note that the operative pleading in the record before us is the plaintiff's original answer and special defense.

[6] The motion for articulation was originally filed, in error, with the Superior Court on February 1, 2011.

Bank, or to any other prior holders of the note. We agree.[7]

Because the claim challenges the trial court's conclusions of law, our review is plenary. See *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, 259 Conn. 592, 598, 790 A.2d 1178 (2002); *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 156, 757 A.2d 14 (2000); *Hunnicutt* v. *Commissioner of Correction*, 67 Conn. App. 65, 68, 787 A.2d 22 (2001).

In setting forth the applicable legal standards, we acknowledge that there is a split of authority among our trial courts regarding an assignee's liability for affirmative claims against the assignor based upon the

---

[7] The dissent suggests that the plaintiff, as an assignee, may be held liable to the defendant for the overcollection of rents from the defendant's tenants by its assignors, because the plaintiff allegedly admitted that all such rents were collected on its behalf by a third party. From that putative admission, the dissent concludes that "there existed no meaningful distinction between the plaintiff and the assignor, its trustee." As the dissent acknowledges, however, the trial court made no finding as to the making or significance of the alleged admission and based no legal conclusion upon it. It is thus not within our power to consider the factual and legal ramifications of the admission on the issues before us, for "[t]he fact-finding function is vested in the trial court . . . . Appellate review . . . is limited both as a practical matter and as a matter of the fundamental difference between the role of the trial court and an appellate court." *Kaplan* v. *Kaplan*, 186 Conn. 387, 391, 441 A.2d 629 (1982). "This court cannot find facts or draw conclusions of fact from primary facts found, but can only review such findings to determine whether they could legally, logically and reasonably be found thereby establishing that the trial court could reasonably conclude as it did. . . . [T]his court must focus on the conclusion of the trial court, as well as the path by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." (Citations omitted.) *Zolan, Bernstein, Dworken & Klein* v. *Milone*, 1 Conn. App. 43, 47, 467 A.2d 938 (1983). Here, then, where the trial court expressly referred to the plaintiff as the assignee and to State Street Bank and its predecessors in title as the assignors of the subject notes and mortgages—without making any of the findings proposed by the dissent as to the supposed unity of interest between them—we cannot join the dissent in concluding that there was no distinction between the plaintiff, as assignee, and its assignor, or that the transfer of the notes and mortgages between them should be treated as something other than an assignment.

assignor's conduct prior to the assignment. Some of our trial courts have found that both defenses and counterclaims can be asserted against the assignee on the basis of the assignor's conduct prior to the assignment. See, e.g., *GMAC Mortgage, LLC* v. *Tornheim,* Superior Court, judicial district of New London, Docket No. CV-09-6001296-S (October 6, 2011); *Deutsche Bank National Trust Co.* v. *Lobaton,* Superior Court, judicial district of New London, Docket No. CV-09-5009907-S (May 5, 2010); *U.S. Bank National Assn.* v. *Garces,* Superior Court, judicial district of New London, Docket No. CV-07-5004536-S (July 17, 2008); *U.S. Bank National Assn.* v. *Reynoso,* Superior Court, judicial district of New London, Docket No. CV-07-5004312-S (July 17, 2008). Other trial courts have found that to be liable for the assignor's preassignment conduct, the assignee must have expressly assumed liability for such conduct. See, e.g., *OneWest Bank, F.S.B.* v. *Reinoso,* Superior Court, judicial district of Fairfield, Docket No. CV-10-6006307-S (May 10, 2012); *IndyMac Bank, F.S.B.* v. *Khan,* Superior Court, judicial district of Fairfield, Docket No. CV-08-5016789-S (April 16, 2010); *Fremont Investment & Loan* v. *Santiago,* Superior Court, judicial district of New London, Docket No. CV-06-5001151-S (January 13, 2010); *Deutsche Bank* v. *Gregory-Boutot,* Superior Court, judicial district of Windham, Docket No. CV-08-5003138-S (July 15, 2009); *WM Specialty Mortgage, LLC* v. *Brandt,* Superior Court, judicial district of Ansonia-Milford, Docket No. CV-09-5001157-S (February 10, 2009); *Deutsche Bank National Trust Co.* v. *Ganci,* Superior Court, judicial district of Hartford, Docket No. CV-05-4017440-S (April 5, 2006); *SCP Corp.* v. *BankBoston,* Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. X01-CV-98-0116198-S (March 18, 1999). For the following reasons, we adopt the latter conclusion.

"An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which

the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance." 3 Restatement (Second), Contracts § 317, pp. 14–15 (1981). Although the general rule is that "[t]he plaintiff, as assignee of the mortgage, [stands] in the shoes of his assignor, *with the same rights*"; (emphasis added; internal quotation marks omitted) *Reynolds* v. *Ramos*, 188 Conn. 316, 320 n.5, 449 A.2d 182 (1982); "unless there has been an express assumption of liability, the assignee is not liable to the debtor for liabilities incurred by the assignor in connection with the subject matter of the assignment." 6A C.J.S. 512, Assignments § 117 (2004). As such, "[i]n the absence of an express contract provision, an assignee generally does not assume the original responsibilities of the assignor, but he or she may be liable for breach of the terms of the assignment or for his or her failure to perform obligations of the assignor which he or she has *assumed*." (Emphasis added.) Id., § 115, p. 511.

However, the "[defendant] may set off any valid claim he or she may have against the [assignor], such as a payment made before the assignment, the rule in this respect being that the assignee takes the mortgage subject to the state of accounts between the [defendant] and the [assignor] as at the time of the assignment."[8]

_____

[8] Although our Supreme Court has recognized that the Uniform Commercial Code, General Statutes § 42a-1-101 et seq., is formally limited to transactions involving personal property, it has determined that the code may furnish a guide for the law governing real property mortgages. See *Olean* v. *Treglia*, 190 Conn. 756, 762, 463 A.2d 242 (1983). As such, we look to General Statutes § 42a-3-305, entitled "Defenses and claims in recoupment," for guidance. That section provides in relevant part: "(a) [T]he right to enforce the obligation of a party to pay an instrument is subject to . . . (3) [a] claim in recoupment of the obligor against the original payee of the instrument if the claim arose from the transaction that gave rise to the instrument; but the claim of the obligor may be asserted against a transferee of the instrument only to reduce the amount owing on the instrument at the time the action is brought." General Statutes § 42a-3-305. This language, as applied to the present case, supports the proposition that the mortgagor

59 C.J.S. 470–71, Mortgages § 438 (2009). Therefore, "an assignee of a contract takes it subject to all *defenses* which might have been asserted against the assignor"; (emphasis added) *Fairfield Credit Corp.* v. *Donnelly*, 158 Conn. 543, 548, 264 A.2d 547 (1969); but does not take it subject to *affirmative claims* against the assignor arising from the assignor's prior conduct without express assumption of such liability by the assignee. If, then, in defense of a foreclosure action brought against him by an assignee of his note and mortgage, the mortgagor defends on the basis that the value of the note at the time of the assignment was less than that claimed by the assignee, the mortgagor may be entitled to a setoff on the ground that the assignee took the note subject to the state of accounts between the assignor and the mortgagor at the time of the assignment. If, on the other hand, the mortgagor responds to the foreclosure action by filing a counterclaim based upon his alleged overpayment of the loan prior to the assignment, the mortgagor must bring a separate claim against the assignor to recover the alleged overpayment unless the assignee has assumed liability for the assignor's preassignment conduct.[9] The assignee, however, is always liable for the mortgagor's overpayment to it.

may only file a claim against the assignor for any alleged misconduct prior to the assignment. The mortgagor may, however, receive a setoff from the assignee for any sums already paid to the assignor on the ground that the assignee takes the note subject to the state of accounts between the assignor and the mortgagor at the time of the assignment.

[9] Notwithstanding the dissent's acknowledgment that this case presents an issue on which our trial courts have been split, it nevertheless suggests that the issue has been decided in Connecticut by citing to and construing language employed by our Supreme Court in *Hartford-Connecticut Trust Co.* v. *Riverside Trust Co.*, 123 Conn. 616, 197 A. 766 (1938), as permitting a right to raise all equitable claims against an assignee. The language in *Hartford-Connecticut Trust Co.*, upon which the dissent relies, is as follows: "While not affected by defenses arising after the assignment, normally the assignee of a chose in action takes subject to all equities and defenses which could have been set up against the chose in the hands of the assignor at the time of the assignment." Id., 626–27. Based upon that language, the dissent suggests that the term "all equities" encompasses all equitable claims that the payor may have had against the assignor of the chose in action,

In the present case, the original agreement between the defendant and the corporation did not include a provision establishing the corporation's liability for an overpayment by the defendant on the note. Moreover, the assignment agreement between the plaintiff and State Street Bank did not include a provision under which the plaintiff assumed liability for the prior conduct of State Street Bank or any other prior holders of the note. As such, neither the assignment nor the original agreement encumbered the plaintiff, as assignee of the note, with liability for State Street Bank's or any other holder's preassignment conduct. The plaintiff, as assignee of the note, had no greater or lesser rights thereunder than those of State Street Bank at the time of the assignment. We thus conclude that the plaintiff could have been found liable only for any overpayment by the defendant that occurred after it took assignment of the note.[10]

specifically including counterclaims for affirmative relief. In so doing, the dissent ignores the context in which that language was used by the Supreme Court. First, the language narrowly preserves the right to assert equities "which could have been set up against the chose in the hands of the assignor at the time of the assignment," not all equitable claims which the payor may then have had against the assignor. The equities in question must therefore have been of the sort that could be asserted to defeat or limit the assignor's right of action or right of recovery under the chose itself, not other equitable claims of any kind or description. Second, the quoted language traces its origins to the earlier case of *Mechanics Bank* v. *Johnson*, 104 Conn. 696, 134 A. 231 (1926), in which our Supreme Court gave examples of such equities consistent with the above-referenced limitation, including "proof of agency, estoppel, or the like . . . ." Id., 700. In light of those examples, which are generally raised by way of defense to a claim, the relevant language, as later cited in *Hartford-Connecticut Trust Co.*, must be construed to preserve the right to raise equities that affect, defeat or limit the claim made by the assignee under the assigned chose in action, not as a generic invitation to the mortgagor to raise and assert other equitable claims it once had against the assignor against the assignee.

[10] In so concluding, we note that the court did not make a determination as to the value of the promissory note at the time that State Street Bank assigned it to the plaintiff. As such, setoff may be warranted.

In addition, we note that this opinion does not address the issue of whether the debtor would have a right of action against the assignee for the assignor's prior misconduct if the assignee had knowledge thereof prior to the assignment.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

In this opinion SCHALLER, J., concurred.

GRUENDEL, J., dissenting. The majority concludes that the trial court improperly found the plaintiff, the city of Hartford, liable to the defendant Brian McKeever[1] for overpayments made to its trustee prior to the assignment of the promissory note in question from its trustee to it. In so doing, the majority adopts a bright line rule that an assignee, in all circumstances, may be held accountable for the liabilities of an assignor only when the assignee expressly assumes responsibility therefor. I believe that such an absolute rule is unwarranted, particularly in the context of equitable proceedings that demand a more flexible approach. I therefore respectfully dissent from the majority opinion.

The relevant facts, as found by the trial court, are as follows. The defendant owned a building in Hartford known as 206-208 Hamilton Street (property), which consisted of twelve rental units. On May 5, 1983, the defendant borrowed a total of $143,065 in two separate loan transactions with the Community Development Corporation (corporation). Both loan transactions involved a promissory note agreement and a separate agreement entitled "Collateral Assignment of Leases and Rentals" (assignment of rents agreement), pursuant to which the corporation could collect rent from the defendant's tenants if he defaulted on his obligation to tender payment on the notes.

Significantly, the court found that the plaintiff "was involved from the beginning" in those loan transactions.

[1] The plaintiff's complaint also named Webster Bank, Helene Fishman, Trustee and the Metropolitan District as defendants. Because they are not parties to this appeal, I refer to Brian McKeever as the defendant in this opinion.

In light of that finding, the court further found that the plaintiff "had an interest from the very beginning and over the years in the execution and administration of the mortgages." Those critical factual findings are supported by the record before us.[2] First and foremost, the plaintiff, prior to trial, admitted both that it was involved in the execution of the notes at issue and that the overpayments giving rise to the defendant's counterclaim were collected on its behalf. In addition, the "Deed of Restrictive Covenants" (deed) signed by the defendant as part of the loan transactions entered into on May 5, 1983, was admitted into evidence at trial as part of plaintiff's exhibit 1.[3] The deed provides that it is granted by the defendant to and for the benefit of, inter alia, the plaintiff and the corporation.[4] The deed

[2] Although those factual findings are not contested by the plaintiff in this appeal, the majority does not acknowledge them in its recitation of facts. Because in my view they are essential to the analysis of the trial court—in which it ultimately concluded that "it would be highly inequitable" for the plaintiff to be unjustly enriched by its retention of almost $200,000 in overpayments by the defendant—I believe it is necessary to briefly review the evidence in the record that substantiates, in convincing fashion, the aforementioned findings. Notably, that evidence was not disputed by the parties in the trial court or this appeal. See *St. Joseph's Living Center, Inc.* v. *Windham*, 290 Conn. 695, 699 n.7, 966 A.2d 188 (2009) ("[w]hen necessary, we supplement the court's findings with facts culled from either undisputed testimony or stipulated exhibits"); *Ledbetter* v. *Commissioner of Correction*, 275 Conn. 451, 453 n.1, 880 A.2d 160 (2005) (supplementing court's findings "with other undisputed facts as appropriate"), cert. denied sub nom. *Ledbetter* v. *Lantz*, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006); *State* v. *Januszewski*, 182 Conn. 142, 144, 438 A.2d 679 (1980) (setting forth recitation of facts predicated on court's memorandum of decision "read in the light of other undisputed facts"), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981), overruled in part on other grounds by *State* v. *Ray*, 290 Conn. 602, 966 A.2d 148 (2009).

[3] Although the court did not explicitly reference the deed in its memorandum of decision, the court did indicate that it evaluated the "documents in evidence as to their consistency or inconsistency with other evidence" and repeatedly referenced plaintiff's exhibit 1, which included the deed. Furthermore, the deed was introduced into evidence by the plaintiff and its substance is not inconsistent with any evidence submitted at trial.

[4] The deed specifically describes the corporation as "the [p]rogram [a]dministrator." Although it does not specifically describe the term "program," it generally concerns the plaintiff's "redevelopment plans," under

states that, in 1982, the plaintiff sold bonds to raise approximately $10 million for the purpose of providing loans to facilitate the rehabilitation of certain residential properties in Hartford. Arthur Greenblatt, a principal of the corporation at all relevant times, testified at trial that the proceeds from the sale of those bonds were delivered directly to the plaintiff's trustee, Colonial Bank (trustee bank).[5] Greenblatt testified that those funds never were furnished to the corporation, nor did the corporation ever lend any of its own money.[6] Rather, the corporation merely would originate a loan and then immediately assign it to the trustee bank.[7] Indeed, the plaintiff averred in its complaint both that the defendant entered into the loan transactions with the corporation on May 5, 1983, and that the corporation assigned those loans to the trustee bank *that very same day.* For that reason, Greenblatt testified that the corporation "never, ever considered any of these [transactions as its] loans. . . . [The corporation] never treated

which the plaintiff issued bonds for the purpose of raising funds to be used as "[r]ehabilitation [l]oans."

[5] Colonial Bank later became State Street Bank & Trust Company of Connecticut, a distinction without a difference in this case.

[6] Greenblatt testified that "[f]rom the very beginning from back in 1982, months, several months before we originated [the defendant's] loan we knew, the [plaintiff] knew, all the attorneys, everybody involved in the entire transaction knew that [the corporation] was never going to use its own money." In addition to substantiating the finding of the trial court that the plaintiff "was involved" and "had an interest from the beginning" in the transactions with the defendant, Greenblatt's testimony on that issue was undisputed at trial.

[7] Far from disagreeing therewith, the plaintiff in its appellate brief sets forth a narrative largely consistent with the court's finding that it was involved in the transactions with the defendant from the beginning. Its brief states in relevant part: "The two loans were originally part of a redevelopment program involving $10 million in tax exempt revenue bonds. The proceeds from the bonds were paid into an account at [the trustee bank] which in turn used a portion of the money to fund the [defendant's] loans. On the date [the defendant] entered into the two loan transactions, checks were tendered to [the defendant] who executed the two subject promissory notes in favor of [the corporation]. The two notes were immediately assigned to [the trustee bank] . . . ."

any of those loans as its asset." Following the immediate assignment of the defendant's loans to the trustee bank, the corporation thereafter continued to service the loans. The aforementioned evidence plainly substantiates the court's factual findings that the plaintiff "was involved" and "had an interest from the very beginning" in the transactions with the defendant.

The court specifically found—and the plaintiff in this appeal does not dispute—that "the accountings and bookkeeping of the [corporation] were a mess." At some point, the corporation believed that the defendant had failed to make payments on the notes.[8] As a result, the corporation began to collect rental payments from the defendant's tenants pursuant to the assignment of rents agreement, rather than exercising the right to declare the notes immediately due and payable. The collection of rental payments from the defendant's tenants gave rise to the overpayments at issue in this litigation. As the court found, "[t]he blame for the overpayment is [on the corporation] for continuing to take rent payments from the tenants under the assignment of rents long after the mortgage was paid off, and then rebuffing the defendant when he complained to it. The corporation was not responsive to him . . . ."

As of July, 2001, the defendant fully had paid one loan in the amount of $28,879. At that time, the trustee bank assigned the note on the second loan to the plaintiff for the sum of one dollar. The plaintiff, mistakenly believing that the defendant had defaulted on his obligations under the second loan, thereafter commenced a foreclosure action against the defendant. Alleging that the defendant had "failed, neglected and/or refused to pay the sums due under the note," the plaintiff sought

[8] In his counterclaim, the defendant refutes that allegation, claiming that "[f]rom May 5, 1983 until April 16, 2003, [the defendant] made payments on the notes according to its tenor to the [plaintiff], their successors or assigns, in the amount of $1705.50 per month."

"(1) [a judgment of] strict foreclosure of its mortgage; (2) immediate and exclusive possession of the mortgaged premises; (3) a deficiency judgment against the [defendant]; (4) interest; (5) reasonable attorney's fees; (6) costs; (7) appointment of a receiver of rents; and (8) such other and further relief as the court deems just and equitable."

In response, the defendant filed a counterclaim that alleged, inter alia, that the plaintiff had received overpayments "in excess of $140,000 from [him], or on his behalf," for which it had not credited him. The defendant further alleged that those payments "were made to the [plaintiff] by third parties" pursuant to the assignment of rents agreement and that although he "has requested the [plaintiff] [to] account to him for the payments, [it] has failed, refused or neglected to do so." Accordingly, the defendant requested an accounting of said payments, money damages, attorney's fees and other relief deemed just and equitable by the court.

Two years after the filing of the defendant's counterclaim, the plaintiff withdrew its foreclosure action against the defendant and acknowledged that it had received excessive payments collected pursuant to the assignment of rents agreement. It thus offered to pay the defendant $17,397.93 related thereto in exchange for his withdrawal of the counterclaim. The defendant declined that overture, contending that the overpayments on the second loan totaled $195,909.

In paragraph six of his counterclaim, the defendant averred that, pursuant to the assignment of rents agreement, "the [plaintiff] on or after May 5, 1983, collected rents from tenants of [the property] in lieu of [the defendant] making payments on the notes to [the plaintiff]." In filing its answer on May 18, 2009, more than six years after the counterclaim was filed, the

plaintiff pleaded the following with respect to that allegation: "The [plaintiff] admits the rentals were being collected pursuant to a collateral assignment of leases and rentals. The [plaintiff] denies that it was collecting the rentals. Instead, a third party was collecting the rent on behalf of the [plaintiff]."[9]

A court trial followed, at the conclusion of which the court found in favor of the defendant. In its November 9, 2010 memorandum of decision, the court found that the defendant "has proven the overpayment of $195,909 and has proven that the [plaintiff] is liable for said overpayments by being an assignee of the [trustee bank], which in turn was an assignee of the [corporation], and the [plaintiff] took the assignment with all of the obligations it and its predecessors had in these transactions. Additionally, it would be highly inequitable for the [plaintiff], [the corporation] and/or [the trustee bank] to be unjustly enriched by monies paid by [the defendant] that were not in fact due."[10] In addition, the court specifically found that of the $195,909 in overpayments, $56,930 was made "while the [plaintiff] had possession and title to the mortgage."

Approximately eleven months later, the plaintiff filed a motion for articulation, which the court granted. In its October 26, 2011 articulation, the court stated that without access to the court file, it could not identify the specific count of the counterclaim on which the defendant had prevailed. The court emphasized that the litigation "was an equitable proceeding initiated by the

[9] On March 22, 2012, the plaintiff filed with the trial court a motion to rectify the record to include an amended answer dated June 8, 2010, that contained an identical response to paragraph six of the counterclaim. The court denied that motion.

[10] The court, as sole arbiter of credibility, expressly credited both the defendant's testimony and exhibit YY in finding a total of $195,909 in overpayments. I agree with the majority that the court did not abuse its discretion in crediting that properly admitted evidence.

plaintiff" and stressed that the counterclaim "was brought while the foreclosure action was still pending." The court also noted that, pursuant to the assignment of rents agreement, the defendant was prohibited from interfering with the collection of rental payments from his tenants. The court thus reiterated its earlier finding that "the payments were not voluntary by him." As the majority correctly notes, the plaintiff did not seek a motion for review pursuant to Practice Book § 66-7 to clarify the distinct legal basis of the court's decision, rendering the record inadequate to review its first claim on appeal.

The record is adequate to review the plaintiff's claim that the court incorrectly determined that it was liable for the overpayments collected from the defendant's tenants pursuant to the assignment of rents agreement prior to the July 19, 2001 assignment of the note from the trustee bank to the plaintiff. For the reasons that follow, I disagree with the majority that the court improperly found the plaintiff so liable under the particular facts of this case.

I

A

Preliminarily, I note that it is undisputed that the corporation assigned the notes in question to the trustee bank the very day that they were entered into and, thus, never received any overpayments as a holder thereof. The assignment of the notes from the corporation to the trustee bank, therefore, has little relevance to the issue at hand. Rather, the only assignment relevant to our inquiry is that from the trustee bank to the plaintiff in July, 2001. The trial court in the present case specifically found that $56,930 of the $195,909 in overpayments was made after that assignment.[11] Accordingly, the pertinent inquiry is whether the court properly held the

---

[11] Although the court specifically found—and the plaintiff on appeal does not dispute—that $56,930 in overpayments was made "while the [plaintiff]

plaintiff liable for the $138,979 in overpayments made while the trustee bank was the holder of the notes.

B

It also bears emphasis that the court found that the present case involves an equitable proceeding "subject to equitable considerations." The parties do not disagree. Indeed, the plaintiff in its appellate brief acknowledges the equitable nature of the proceeding, citing to *Fellows* v. *Martin*, 217 Conn. 57, 64–65, 584 A.2d 458 (1991), for the proposition that "once any equitable claim has been raised, the court retains its equitable jurisdiction to consider all of the equities before it in order to render complete justice . . . even where the equitable jurisdiction was conferred by a defendant's counterclaim."[12] (Citations omitted.) Indeed, the plaintiff in this appeal argues that the court, "based on the record, did not act equitably and should be reversed."[13]

The present litigation was commenced by the plaintiff in an attempt to foreclose on the defendant's property. Foreclosure patently is an equitable proceeding. See, e.g., *Deutsche Bank National Trust Co.* v. *Angle*, 284 Conn. 322, 326, 933 A.2d 1143 (2007). Moreover, the gravamen of the defendant's counterclaim was that the

had possession and title to the mortgage," the majority opinion does not acknowledge that finding. To the contrary, it asserts that the court did not make a finding related thereto.

[12] As our Supreme Court has explained, "[w]hen a court of equity obtains jurisdiction to determine the rights of the parties, it will retain it and give appropriate relief. . . . [J]urisdiction in equity once acquired is retained for the purpose of giving full relief concerning the subject-matter. . . . Since he who seeks equity must do equity, the [appellant], pressing its claim against the receiver in this action, opened the door to the latter's defense by way of cross-complaint, it being germane to the matter in controversy." (Citations omitted.) *Beach* v. *Beach Hotel Corp.*, 117 Conn. 445, 452, 168 A. 785 (1933).

[13] In his appellate brief, the defendant likewise submits that "the matter involves the application of equity," although he disagrees with the plaintiff's contention that the court failed to act equitably.

plaintiff unjustly "has received in excess of $140,000" in overpayments. In addition, the defendant in his counterclaim specifically requested equitable relief from the court. In finding the plaintiff liable for the overpayments made to its trustee, the court concluded, inter alia, that "it would be highly inequitable for the [plaintiff] . . . to be unjustly enriched by monies paid by [the defendant] that were not in fact due."

"Equity always attempts to get at the substance of things, and to ascertain, uphold, and enforce rights and duties which spring from the real relations of parties. It will never suffer the mere appearance and external form to conceal the true purposes, objects, and consequences of a transaction." (Internal quotation marks omitted.) *Morgera* v. *Chiappardi*, 74 Conn. App. 442, 458, 813 A.2d 89 (2003), citing 2 J. Pomeroy, Equity Jurisprudence (5th Ed. 1941) § 378, pp. 40–41. As our Supreme Court observed, "[e]quity always looks to the substance of a transaction and not to mere form . . . and seeks to prevent injustice." (Citation omitted; internal quotation marks omitted.) *Natural Harmony, Inc.* v. *Normand*, 211 Conn. 145, 149, 558 A.2d 231 (1989). Accordingly, "[t]he governing motive of equity in the administration of its remedial system is to grant full relief, and to adjust in the one suit the rights and duties of all the parties, which really grow out of or are connected with the subject-matter of that suit." (Internal quotation marks omitted.) *Maruca* v. *Phillips*, 139 Conn. 79, 82–83, 90 A.2d 159 (1952).

"In an equitable proceeding, the trial court may examine all relevant factors to ensure that complete justice is done. . . . The determination of what equity requires in a particular case, the balancing of the equities, is a matter for the discretion of the trial court. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action." (Citation omitted; internal

quotation marks omitted.) *AvalonBay Communities, Inc.* v. *Sewer Commission*, 270 Conn. 409, 417, 853 A2d 497 (2004).

## II

Turning to the merits of the principal issue before this court, I believe the court's finding of liability should stand. The question of an assignee's responsibility for the liabilities of its assignor is one on which the authority of our Superior Court is split. The majority today resolves that division by adopting a bright line rule that an assignee may be held accountable for the liabilities of an assignor only when the assignee expressly assumes responsibility therefor. I disagree and, guided by the precedent of our state and federal supreme courts, as well as persuasive authority from other jurisdictions, respectfully suggest that a more flexible approach is necessary.

## A

"It is hornbook law . . . that an assignee stands in the shoes of the assignor. . . . An assignee has no greater rights or immunities than the assignor would have had if there had been no assignment." (Citations omitted; internal quotation marks omitted.) *Shoreline Communications, Inc.* v. *Norwich Taxi, LLC*, 70 Conn. App. 60, 72, 797 A.2d 1165 (2002). As our Supreme Court explained, "the assignee of a chose in action takes subject to all equities and defenses which could have been set up against the chose in the hands of the assignor at the time of the assignment." *Hartford-Connecticut Trust Co.* v. *Riverside Trust Co.*, 123 Conn. 616, 626–27, 197 A. 766 (1938).

The distinct question presented in this case is whether an assignee of a mortgage note may be held responsible for the liabilities of the assignor, by way

of counterclaim, after it commences foreclosure proceedings against a mortgagor. On that issue our Superior Court authority is split. One line of cases, with which the majority here agrees, holds the assignee responsible only when it expressly assumes such liability. See, e.g., *Fremont Investment & Loan* v. *Santiago*, Superior Court, judicial district of New London, Docket No. CV-06-5001151-S (January 13, 2010). Another line of cases holds that when an assignee initiates a foreclosure action against a mortgagor, the assignee in that equitable proceeding is "subject to all counterclaims and defenses that could be asserted against its assignor." (Internal quotation marks omitted.) *Deutsche Bank National Trust Co.* v. *Lobaton*, Superior Court, judicial district of New London, Docket No. CV-09-5009907-S (May 5, 2010). In my view, neither approach properly resolves the question presented in this case. I believe the more reasoned analytical approach, and the one most consistent with the precedent of our Supreme Court, is to generally preclude affirmative claims against an assignee arising from the acts or liabilities of the assignor, while at the same time permitting equitable claims that merit exception therefrom.

I thus begin by noting my general agreement with the position adopted by the majority. In the normal case, an obligor "may use defensively against an assignee an offsetting claim against the assignor, although the assignee is not subject to affirmative liability on such a claim unless he contracts to assume such liability." 3 Restatement (Second), Contracts § 336, comment (c), p. 68 (1981). Likewise, in addressing the liabilities of an assignee "generally," Corpus Juris Secundum notes that "[i]n the absence of an express contract provision, an assignee is not required to assume the original responsibilities of the assignor"; 6A C.J.S. 511, Assignments § 115 (2004); and further states that "[a]s a general rule, unless there has been an express assumption

of liability, the assignee is not liable to the debtor for liabilities incurred by the assignor . . . ." (Emphasis added.) Id., § 117, p. 512.

Some courts, like the majority here, have adopted that general rule as a strict, bright line test. The decision of the Missouri Court of Appeals in *Standard Insulation & Window Co.* v. *Dorrell*, 309 S.W.2d 701 (Mo. App. 1958), exemplifies that approach. At issue in that case was whether an obligor could recover an overpayment made to the assignor of the promissory note in question. Id., 702. In answering that query in the negative, the court stated: "[I]n an action by an assignee, a claim in favor of defendant against the assignor can be allowed as a set-off, counterclaim, or reconvention only to the extent of the claim sued on, and judgment cannot be rendered against the assignee for the excess. Defendant is entitled to use his claim defensively, and not offensively . . . . [The obligor's] claim of payment and overpayment is truly a defense to the negotiable instrument itself rather than a claim against plaintiff, in whose hands the note came to rest. . . . Defendant-maker, by his counterclaim, resisted and completely overcame liability under the negotiable instrument. He has no further valid claim against the plaintiff-assignee." (Internal quotation marks omitted.) Id., 704–705.

In adopting that view, I respectfully submit that the majority gets it half right. The precedent of this state's highest court instructs that an assignee takes subject not only to all defenses, but also to "all equities" that "could have been set up against the chose in the hands of the assignor at the time of the assignment." *Hartford-Connecticut Trust Co.* v. *Riverside Trust Co.*, supra, 123 Conn. 626–27; see also *Baker* v. *Wood*, 157 U.S. 212, 216, 15 S. Ct. 577, 39 L. Ed. 677 (1895) ("in respect of the assignment of choses in action, not negotiable, the assignee takes subject to the equities between the debtor and the original creditor subsisting at the time

of the assignment"); *Railroad Co.* v. *Howard*, 74 U.S. (7 Wall.) 392, 19 L. Ed. 117 (1868) ("assignees take them subject to every equity affecting them in the hands of the original holder"); *Adams* v. *Leavens*, 20 Conn. 73, 79 (1849) (assignee takes "subject to all the equities existing at the time the assignment was made"); 59 C.J.S. 470, Mortgages § 438 (2009) ("assignee of a mortgage ordinarily takes it subject to all equities and defenses between the original parties which arose out of the mortgage transaction prior to the assignment"); 29 R. Lord, Williston on Contracts (4th Ed. 2003) § 74:47, pp. 546–47 (assignee subject to all equities existing in favor of debtor). In holding that an assignee takes subject to defenses alone, the majority effectively excises from our decisional law the aforementioned precept.

Because under our law an assignee takes subject to all defenses *and* all equities that could have been raised by the obligor against the assignor at the time of the assignment, I believe that the proper inquiry into whether an assignee may be responsible for the liabilities of an assignor entails consideration of whether the obligor's claim is equitable in nature. Only if the obligor's claim is an equitable one should a court depart from the general rule precluding assignee liability and proceed to a determination as to whether, on the facts presented, the equities demand relief therefrom. That analytical approach gives meaning to our precedent recognizing that an assignee is subject to both defenses and equities existing at the time of assignment.

Indeed, other courts confronting this issue have focused their analysis of an assignee's liability on the equitable nature of an obligor's claim against it. In *Irrigation Assn.* v. *First National Bank of Frisco*, 773 S.W.2d 346, 348 (Tex. App. 1989), writ denied (September 13, 1989), the court framed the issue before it as "whether a rule of law that was fashioned as a shield against liability may also be employed as a spear by

means of which an affirmative recovery may be secured." The court observed that "[t]here is little authority squarely on point. . . . Nationally, only a limited number of cases in point are to be found and, as might be expected, they do not present a uniform view." Id., 348–49. The court rejected a bright line test prohibiting affirmative suits against an assignee for the recovery of payments to which the assignor was not entitled. Id., 350. Instead, the court considered the equitable nature of the claim against the assignee. It stated: "Claims by the [obligor] demanding that an assignee return money already paid on grounds that the assignor has failed to perform the contract *constitute claims for restitution.* Claims for restitution are governed by *equitable principles.*" (Emphasis in original.) Id. Accordingly, to determine whether the assignee in that case could be held liable for the overpayments made to the assignor, the court weighed the equities by focusing on "the circumstances here present . . . ." Id., 347. In so doing, the court concluded that "we can find no equitable considerations militating in favor of a judgment that would transfer [the obligor's] loss to [the assignee] and make the loss into assignee's loss. Assignee was every bit as blameless for the loss as was [the obligor], if not more so. . . . We decline to transfer that loss to assignee, an essentially blameless party." Id., 351; see also *Benton State Bank* v. *Warren,* 263 Ark. 1, 562 S.W.2d 74 (1978) (holding assignee bank liable for payment made to assignor, after weighing equities).

Similarly, in considering the equitable nature of a claim against an assignee, the Supreme Court of Montana, in *Massey-Ferguson Credit Corp.* v. *Brown,* 173 Mont. 253, 260–61, 567 P.2d 440 (1977), found "the close relationship and participation between the assignor and assignee" dispositive in imposing liability on the assignee for an overpayment made to the assignor. The issue presented in that case was whether the obligor

was "entitled to receive from [the assignee] the value of the [payment made to the assignor] over and above being absolved from making any payments on the contract"; id., 255; that is, whether the obligor could maintain an affirmative claim against the assignee for a liability of the assignor. The court, upon examination of "these particular facts"; id., 261; concluded that "the close relationship and participation between the assignor and assignee requires a departure from the general rule of law" prohibiting such affirmative claims. Id., 258. The court emphasized that "[t]he evidence shows that [the assignee] participated, at least to some degree," in the underlying transaction. (Internal quotation marks omitted.) Id., 255. The court further emphasized that the "close relationship and participation between the assignor and assignee put [the assignee] on notice of the claims which might arise. Due to this knowledge and participation, [the assignee] was vulnerable to the [obligor's] counterclaim." Id., 260–61. As a result, the court concluded that "[u]nder these particular facts, [the assignee] is more than a mere assignee." Id., 261. The court thus held that "this case requires an exception to the general rule" precluding affirmative claims against an assignee for the liability of the assignor and permitted the obligor to recover his overpayment from the assignee. Id., 261–62. That persuasive authority is consistent with the Restatement (Second) of Contracts, which recognizes that "[t]he conduct of the assignee or his agents may . . . give rise to defenses and claims which may be asserted against him by the obligor," including the situation wherein an obligee who is subject to a claim attempts to evade liability by "assigning the right to an assignee who is not subject to the defense or claim . . . ." 3 Restatement (Second), supra, § 336, comment (h), p. 72; see also 6A C.J.S. 525, supra, § 132 ("the conduct of an assignee, which antedated the assignment, could

be used as a defense in an action brought by the assignee on the assigned claim").

I find the reasoning of the aforementioned authorities compelling, particularly in the context of equitable proceedings like the present one, in which the plaintiff commenced a foreclosure action against the defendant despite the collection of almost $200,000 in overpayments on its behalf. Accordingly, although I agree generally with the majority that an obligor, in the normal course, may not maintain an affirmative claim against an assignee arising from the acts or liabilities of the assignor, I would except from that general rule those situations in which said claim was equitable in nature and on which the equities demand relief therefrom.

The present case is a quintessential example of the need for, and the appropriateness of, that exception. As in *Massey-Ferguson Credit Corp.* v. *Brown,* supra, 173 Mont. 255, the plaintiff here was involved in the loan transactions from the beginning, as the trial court specifically found and as the plaintiff admitted in its answer.[14] The loans furnished to the defendant were funded and issued as part of the plaintiff's rehabilitation program. The deed signed by the defendant as part of those transactions specifically provides that it is granted by the defendant to and for the benefit of, inter alia, the plaintiff. Significantly, the two promissory notes in question were assigned to the trustee bank the very day they were entered into, and thereafter were held at all times by the trustee bank on behalf of the plaintiff.

[14] Paragraph three of the defendant's counterclaim alleged that "[o]n or about May 5, 1983, the [defendant] executed two promissory notes to [the plaintiff] in exchange for loans of $114,186 and $28,879. Also on said date, the [defendant] executed a mortgage to the [plaintiff] to secure payment of said loans for [the property]." In its answer, the plaintiff admitted that allegation.

Moreover, the plaintiff admitted that all overpayments giving rise to the defendant's counterclaim were collected on its behalf, and thus inured to its benefit. It is bedrock law that an admission in an answer to an allegation in a complaint is binding as a judicial admission. *Franchi* v. *Farmholme, Inc.*, 191 Conn. 201, 214, 464 A.2d 35 (1983); *Lutkus* v. *Kelly*, 170 Conn. 252, 257, 365 A.2d 816 (1976); *Bridgeport* v. *Stratford*, 142 Conn. 634, 646, 116 A.2d 508 (1955); 71 C.J.S. 228, Pleading § 195 (2011) (admission in answer binding on party making it and "supports a presumption or inference of such other facts as normally follow from the establishment of such fact"). As this court has explained, "[p]leadings are intended to limit the issues to be decided at the trial of a case and [are] calculated to prevent surprise. . . . [The] purpose of pleadings is to frame, present, define, and narrow the issues, and to form the foundation of, and to limit, the proof to be submitted on the trial . . . . Accordingly, [t]he admission of the truth of an allegation in a pleading is a judicial admission conclusive on the pleader. . . . A judicial admission dispenses with the production of evidence by the opposing party as to the fact admitted, and is conclusive upon the party making it. . . . [The] admission in a plea or answer is binding on the party making it, and may be viewed as a conclusive or judicial admission . . . . It is axiomatic that the parties are bound by their pleadings." (Citations omitted; internal quotation marks omitted.) *Rudder* v. *Mamanasco Lake Park Assn., Inc.*, 93 Conn. App. 759, 768–69, 890 A.2d 645 (2006).

Paragraph six of the defendant's counterclaim alleged that, pursuant to the assignment of rents agreement, "the [plaintiff] on or after May 5, 1983, collect[ed] rents from tenants of [the property] in lieu of [the defendant] making payments on the notes to [the plaintiff]." In answering that allegation, the plaintiff admitted that

"the rentals were being collected pursuant to a collateral assignment of leases and rentals. . . . [A] third party was collecting the rent *on behalf of* [*the plaintiff*]."[15] (Emphasis added.) Significantly, the plaintiff did not assert that the trustee bank was the recipient or beneficiary of those rent payments, which resulted in overpayment—its answer specifically and unequivocally stated that the rent payments were collected *on its behalf.*[16] That admission certainly is understandable in light of the unique circumstances of this case, in which the assignor, at all times, held the notes as the trustee of the assignee, the plaintiff. The plaintiff's admission thus served to "frame, present, define, and narrow the issues, and to form the foundation of, and to limit, the proof to be submitted on the trial"; (internal quotation marks omitted) *Rudder* v. *Mamanasco Lake Park Assn., Inc.*, supra, 93 Conn. App. 768; in two critical respects. First, it established that, with respect to the collection of overpayments on the notes, there existed no meaningful distinction between the plaintiff and the assignor, its trustee. Second, the plaintiff's admission that the rent payments were collected on its behalf necessarily acknowledges that the plaintiff was the beneficiary of the overpayments made on behalf of the defendant.[17]

---

[15] The majority curiously characterizes the plaintiff's judicial admission in paragraph six of its answer to the counterclaim that the rental payments were collected on its behalf as an "alleg[ed]" and "putative" admission. It provides no authority for that novel proposition. Contra *Franchi* v. *Farmholme, Inc.*, supra, 191 Conn. 214; *Rudder* v. *Mamanasco Lake Park Assn., Inc.*, supra, 93 Conn. App. 768–69.

[16] In light of that admission, I respectfully suggest that the majority is mistaken when it states that the plaintiff's answer denied the essential allegations of the counterclaim.

[17] Although the majority accuses this dissent of making a "proposed" finding "as to the supposed unity of interest" between the plaintiff and the trustee bank, the majority opinion neither acknowledges nor credits the trial court's explicit finding that, because the trustee bank acted at all times as the plaintiff's trustee, the plaintiff "had an interest from the very beginning and over the years in the execution and administration of the mortgages."

More importantly, the plaintiff's judicial admission that all of the overpayments were collected on its behalf substantiates, and appears to underlie, the court's finding that the plaintiff "had an interest from the very beginning and over the years in the execution and administration of the mortgages."[18] In my view, that critical finding pervades the court's memorandum of decision and is essential to its determination that "it would be highly inequitable for the [plaintiff] . . . to be unjustly enriched by monies paid by [the defendant] that were not in fact due." The undisputed evidence before the court indicates that this is not the normal case in which a promissory note and the attendant legal obligations were passed from an assignor to a detached third party assignee. This is the exceptional case where, by the plaintiff's admission, there existed no meaningful difference between the assignor and assignee, as the assignor held the note in question at all times as the plaintiff's trustee. Under those particular facts, I would conclude that the plaintiff is "more than a mere assignee"; *Massey-Ferguson Credit Corp.* v. *Brown,* supra, 173 Mont. 261; and that "the close relationship

---

[18] As the majority notes, the plaintiff has not presented this court with an adequate record to determine the distinct legal basis of the court's decision. Accordingly, this court cannot definitively say that the court relied on the plaintiff's admission that the overpayments were collected on its behalf. At the same time, the court in its memorandum of decision expressly found that "it would be highly inequitable for the [plaintiff] . . . to be unjustly enriched by monies paid by [the defendant] that were not in fact due." In reviewing the court's exercise of discretion in an equitable proceeding, "this court must make every reasonable presumption in favor of its action." (Internal quotation marks omitted.) *AvalonBay Communities, Inc.* v. *Sewer Commission,* supra, 270 Conn. 417. When considered in tandem with the fundamental precept that "[t]his court does not presume error on the part of the trial court"; *State* v. *Tocco,* 120 Conn. App. 768, 781 n.5, 993 A.2d 989, cert. denied, 297 Conn. 917, 996 A.2d 279 (2010); accord *Kaczynski* v. *Kaczynski,* 294 Conn. 121, 129–30, 981 A.2d 1068 (2009) (presume court undertook proper analysis of law and facts and acted properly in rendering judgment); we must presume that the court properly considered the plaintiff's admission as conclusive on it, consistent with Connecticut law. See *Rudder* v. *Mamanasco Lake Park Assn., Inc.,* supra, 93 Conn. App. 769.

and participation between the assignor and assignee requires a departure from the general rule of law." Id., 258.

This court's analysis of the issue before us is hampered by the lack of an adequate record to determine the distinct legal basis of the court's decision. Mindful of our obligation to make every reasonable presumption in favor of the court's action in fashioning equitable relief; *AvalonBay Communities, Inc.* v. *Sewer Commission*, supra, 270 Conn. 417; I construe the decision of the trial court as an attempt "to get at the substance of things, and to ascertain, uphold, and enforce rights and duties which spring from the real relations of parties." (Internal quotation marks omitted.) *Morgera* v. *Chiappardi*, supra, 74 Conn. App. 458. The court specifically found that the plaintiff "was involved" and "had an interest from the very beginning and over the years in the execution and administration of the [defendant's] mortgages." Put simply, the court looked to the substance of the transactions and sought to prevent injustice. See *Natural Harmony, Inc.* v. *Normand*, supra, 211 Conn. 149.

The gist of the defendant's counterclaim is that the plaintiff unjustly benefitted from the receipt of almost $200,000 in overpayments collected on its behalf from the defendant's tenants. Upon examination of the circumstances and the conduct of the parties, the court in the present case concluded that "it would be highly inequitable for the [plaintiff] . . . to be unjustly enriched by monies paid by [the defendant] that were not in fact due." I concur. It would be contrary to equity and good conscience for the plaintiff to retain a benefit—in this case the excessive collection of $195,909 on its behalf—which has come to it at the expense of another. See *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 433, 451, 970 A.2d 592 (2009). In light of those equitable considerations, I

therefore would depart from the general rule precluding an affirmative claim against an assignee arising from the acts or liabilities of the assignor. Because the assignor acted at all times as the trustee of the plaintiff assignee and because the overpayments at issue at all times inured to the plaintiff's benefit, "the equities existing at the time the assignment was made"; *Adams* v. *Leavens*, supra, 20 Conn. 79; demand that the defendant be permitted to maintain his counterclaim against the plaintiff for the recovery of the aforementioned overpayments. I, therefore, would affirm the judgment of the trial court.