******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PALMER, J., with whom McDONALD, J., joins, dissenting. I agree with the majority that, as a general matter, an innocent assignee of a note and mortgage does not assume the original responsibilities of the assignor and, therefore, is not liable for affirmative claims against the assignor by the obligor. I disagree, however, with the majority's determination that the Appellate Court was not required to address the claim of the named defendant, Brian McKeever (defendant), that it should recognize and apply an equitable exception to this rule. The majority concludes that the Appellate Court was not required to address this claim because the trial court did not address it, and, therefore, the record is inadequate for review. Contrary to the majority's assertion, and as I explain more fully hereinafter, it is clear that the trial court did address the defendant's claim. But even if it had not, the plaintiff, the city of Hartford (city), has never denied the fundamental facts underlying it—namely, that the city always was the real party in interest to the notes and mortgages and, additionally, that all of the defendant's overpayments were collected by the city's trustee[1] on behalf of the city. Indeed, not only did the city admit these facts in its pleadings—admissions that are binding on it[2]— counsel for the city expressly stated at oral argument before this court that the city *never has claimed otherwise*. In light of these admissions, the majority's conclusion that the record is inadequate for review of the defendant's equitable claim is unsustainable.

In reaching its contrary determination, the majority rejects the defendant's contention that the record is sufficient for appellate review because the trial court expressly found that the city was not an innocent assignee but, rather, was "involved [in the transactions] from the [very] beginning," that "it would be highly inequitable for the city . . . to be unjustly enriched by [money] paid by [the defendant] that [was] not in fact due," and that the city "had an interest from the very beginning and over the years in the execution and administration of the mortgages." Rather than defer to these findings, the majority dismisses them as mere "dicta." Footnote 12 of the majority opinion. The majority also rejects the defendant's contention that the record is adequate for review because the city never disputed that it was involved in the execution and administration of the notes and mortgages from the beginning, and even admitted in its pleadings that it was *a party* to those transactions.[3] Instead, the majority dismisses the city's admissions as "inexplicable" and posits that "[p]erhaps the [city] intended to admit that it now had the rights of a payee on the subject notes pursuant to the assignment." Footnote 14 of the majority opinion. Contrary to the majority's assertion, the

city's admissions are not inexplicable. Indeed, the city *explained* them to this court at length at oral argument. When a panel member asked the city's appellate counsel during argument whether the city ever has claimed that the notes and mortgages were not executed and administered by the Community Development Corporation (CDC) solely on behalf of the city, counsel stated: "I don't think the city could ever make that argument." She then explained that the city was required by law to have a third party execute and administer the loans and mortgages. She stated: "[The] CDC was the mortgage holder [at] the beginning [because] you have to have [a separate] entity handle these transactions. . . . [You] have to have a trustee . . . collect the money . . . . Whoever was administering the [mortgage, however] was doing so for the benefit of the city . . . . *I have no reason to contest that statement.* . . . Everything that I reviewed [makes that] pretty clear. . . . The trust was set up as required by law to act as [a] fiduciary to make sure payments are being applied to satisfy bonds that were issued [by the city]." (Emphasis added.) In light of these concessions, which mirror the admissions contained in the city's pleadings, the majority's repeated assertion that the record is inadequate to review the defendant's claim that the CDC and the trustee were acting at all times on behalf of the city and for the benefit of the city is itself inexplicable.[4]

Furthermore, as Judge Gruendel observed in his dissenting opinion in the Appellate Court, even if the city's admissions were insufficient to establish the essential facts underlying the defendant's equitable claim, there is other evidence in the record that clearly establishes the relationship between the city and the CDC. See *Hartford* v. *McKeever*, 139 Conn. App. 277, 291, 55 A.3d 787 (2012) (*Gruendel, J.*, dissenting). For example, "the 'Deed of Restrictive Covenants' . . . signed by the defendant as part of the loan transactions . . . was admitted into evidence at trial as part of [the city's] exhibit 1. The deed provides that it is granted by the defendant to and for the benefit of . . . *the* [*city*] and the [CDC, *as program administrator*]. The deed [further] state[d] that, in 1982, the [city] sold bonds to raise approximately $10 million for the purpose of providing loans to facilitate the rehabilitation of certain residential properties in Hartford." (Emphasis added; footnotes omitted.) Id., 289–90 (*Gruendel, J.*, dissenting). Moreover, "the [city] in its [A]ppellate [Court] brief sets forth a narrative largely consistent with the court's findings that it was involved in the transactions with the defendant from the beginning. Its [Appellate Court] brief [provides] in relevant part: 'The two loans were originally part of a redevelopment program [by the city] involving $10 million in tax exempt revenue bonds. The proceeds from the bonds were paid into an account at [the trustee bank] which in turn used a portion of the money to fund the [defendant's] loans. On the date [that the defendant]

entered into the two loan transactions, checks were tendered to [the defendant] who executed the two subject promissory notes in favor of [the CDC]. *The two notes were immediately assigned to [the trustee bank]* . . . ." (Emphasis added.) Id., 290 n.7 (*Gruendel, J.,* dissenting). Thus, as the city explained to this court, although the original notes and mortgages were executed in favor of the CDC, the CDC's role was strictly that of loan facilitator and administrator, which is why it immediately assigned the notes and mortgages to the city's trustee.

The majority also incorrectly asserts that there is no evidence that "the [city] was unjustly enriched by the [defendant's] overpayments"; text accompanying footnote 13 of the majority opinion; and, therefore, that there was no basis to conclude that the equities favor the defendant. Once again, the majority refuses to acknowledge that the city never has denied that the overpayments were collected by the trustee on its behalf, as required by law, and that the money went directly to the city to pay its bondholders. Indeed, during oral argument, counsel for the city stated that it would have been "fatal" to the city's tax exempt bond program if the money had been used for any other purpose. Thus, contrary to the majority's suggestion, to the extent that the record lacks direct evidence that the city benefited from the defendant's overpayments, it is only because the city never has claimed otherwise. At trial, and on appeal to the Appellate Court, the city disputed only the *amount* of the overpayments and whether it was legally responsible for overpayments that occurred prior to the assignment.[5] Consistent with the city's concession in this court, the brief that the city filed in the present appeal does not contain the slightest suggestion that the city did not benefit from the payments made to its bondholders on its behalf. The majority alone makes an unsupported contention to the contrary.

I also disagree with the majority's assertion that the trial court never addressed the defendant's equitable claims, and, as a consequence, the Appellate Court also was not required to address them. At trial and in his posttrial briefs, the defendant maintained that the city, rather than the trustee or the CDC, was always the real party in interest, as evidenced by the loan and mortgage documents and the fact that, "when the bonds were paid, [the trustee] assigned its rights with respect to the [remaining] note and mortgage to the city for [only $1]. . . . If money was still due under the note and mortgage, why else would the city obtain the right to collect money under the note and mortgage unless it was a real party to the total transaction from the beginning?" Indeed, as I previously discussed, the defendant alleged in his counterclaim that the city was a party to the notes and mortgages, which the city admitted.[6] The trial court's finding that the city was involved in the

transactions from the beginning is obviously responsive to this contention. In his posttrial briefs, the defendant also argued that, because this was a foreclosure action, equitable principles applied and this constituted a separate basis for the trial court to find in favor of the defendant. In his reply brief, the defendant argued: "It is incomprehensible, and certainly not equitable, for the city to now say that the manner in which the loan was serviced, for its benefit, is not the city's ultimate responsibility. Colonial Bank and its successors were the city's trustees. The servicer of the loan was servicing the loan for the city's trustee. Certainly, equity should not allow the actual party in interest to hide behind such an inequitable cloak." (Emphasis omitted.) The city, of course, never disputed any of the facts underlying this argument. To the contrary, the city's position was and remains a strictly legal one, namely, that this court should adopt a bright line rule that an assignee is never liable for claims against the assignor unless the assignee contractually assumes such liability. As Judge Gruendel explained in his dissenting opinion in the Appellate Court, however, the general rule that an assignee takes a note and mortgage free of any affirmative claims against the assignor should apply only when the assignment constituted an arm's-length transaction between unrelated parties, not when, as in the present case, the assignee was the real party in interest all along. See *Hartford* v. *McKeever*, supra, 139 Conn. App. 301–303 (*Gruendel, J.*, dissenting) (citing and discussing applicable cases and authorities); see also *Massey-Ferguson Credit Corp.* v. *Brown*, 173 Mont. 253, 260–61, 567 P.2d 440 (1977) (assignee liable for overpayments made to assignor in light of "close relationship and participation between the assignor and assignee").

Furthermore, although the trial court never specified the count or counts of the counterclaim on which the defendant had prevailed, it expressly noted in its memorandum of decision that the defendant was seeking an accounting from the city. It is well established that "[a]n action for an accounting calls for the application of equitable principles."[7] *Travis* v. *St. John*, 176 Conn. 69, 74, 404 A.2d 885 (1978). The trial court also addressed the equitable nature of the defendant's claim when it found that "this is a foreclosure action with a counterclaim and, therefore, [is] subject to equitable considerations." After addressing the parties' legal arguments, the trial court further stated: "Additionally, it would be highly inequitable for the city, [the] CDC and/or [the trustee] to be unjustly enriched by [money] paid by [the defendant] that [was] not in fact due. Accordingly, judgment is entered for the defendant . . . in the total amount of $195,909." This finding, as well as the court's finding that the city was involved in the transactions from the beginning, is directly responsive to the defendant's claim that "[i]t is incomprehensible, and certainly not equitable, for the city to now say that the manner

in which the loan was serviced, for its benefit, is not the city's ultimate responsibility." (Emphasis omitted.)

Nevertheless, as I have explained, even if the trial court had not addressed the defendant's equitable claims, there is nothing to prevent this court from doing so on the basis of the pleadings and the undisputed evidence in the record clearly establishing that the CDC was simply a proxy or agent for the city with respect to the execution and administration of the notes and mortgages. Moreover, even if the record required further fact-finding in order to resolve this claim, the proper disposition would be to remand the case to the trial court for additional findings on that issue; the trial court did not address the claim only because it improperly had found in favor of the defendant on another claim, a determination that was based on an incorrect interpretation of the law.[8] I therefore respectfully dissent.

[1] The city's trustee initially was Colonial Bank. State Street Bank and Trust Company of Connecticut subsequently became the city's trustee.

[2] As Judge Gruendel explained in his dissenting opinion in the Appellate Court: "[T]he [city] admitted that all overpayments giving rise to the defendant's counterclaim were collected on its behalf, and thus inured to its benefit. It is bedrock law that an admission in an answer to an allegation in a complaint is binding as a judicial admission. *Franchi* v. *Farmholme, Inc.*, 191 Conn. 201, 214, 464 A.2d 35 (1983); *Lutkus* v. *Kelly*, 170 Conn. 252, 257, 365 A.2d 816 (1976); *Bridgeport* v. *Stratford*, 142 Conn. 634, 646, 116 A.2d 508 (1955); [see also] 71 C.J.S. 228, Pleading § 195 (2011) (admission in answer binding on party making it and 'supports a presumption or inference of such other facts as normally follow from the establishment of such fact'). As [the Appellate Court] has explained, '[p]leadings are intended to limit the issues to be decided at the trial of a case and [are] calculated to prevent surprise. . . . [The] purpose of pleadings is to frame, present, define, and narrow the issues, and to form the foundation of, and to limit, the proof to be submitted on the trial . . . . Accordingly, [t]he admission of the truth of an allegation in a pleading is a judicial admission conclusive on the pleader. . . . A judicial admission dispenses with the production of evidence by the opposing party as to the fact admitted, and is conclusive [as to] the party making it. . . . [The] admission in a plea or answer is binding on the party making it, and may be viewed as a conclusive or judicial admission . . . . It is axiomatic that the parties are bound by their pleadings.' . . . *Rudder* v. *Mamanasco Lake Park Assn., Inc.*, 93 Conn. App. 759, 768–69, 890 A.2d 645 (2006)." *Hartford* v. *McKeever*, 139 Conn. App. 277, 304, 55 A.3d 787 (2012) (*Gruendel, J.*, dissenting).

[3] "Paragraph six of the defendant's counterclaim alleged that, pursuant to the assignment of rents agreement, 'the [city] on or after May 5, 1983, collect[ed] rents from the tenants of [the property] in lieu of [the defendant] making payments on the notes to [the city].' In answering that allegation, the [city] admitted that 'the rentals were being collected pursuant to a collateral assignment of leases and rentals. . . . [A] third party was collecting the rent on behalf of [the city].'" (Emphasis omitted.) *Hartford* v. *McKeever*, 139 Conn. App. 277, 304–305, 55 A.3d 787 (2012) (*Gruendel, J.*, dissenting).

[4] For example, the majority concludes "that the Appellate Court properly determined that the trial court had made no factual findings as to the significance of the relationship between the [city], on the one hand, and the [CDC and the trustees], on the other hand, and that the judgment of the trial court was not based on this relationship or any equitable considerations that flowed from it." Only by ignoring the record and the city's concessions at oral argument before this court can the majority reach such a conclusion. The majority also takes issue "with [my] statement that [the majority has] repeatedly asserted that the record is inadequate to review the defendant's claim that the [CDC and the trustees] were acting at all times on behalf of the [city] and for the benefit of the [city]." Footnote 14 of the majority opinion. The majority argues that it has "concluded only that the record is inadequate to determine (1) the legal ramifications of the

fact that . . . [the] trustees . . . were obligated to act on the [city's] behalf, and (2) whether the [city] actually benefited from the overpayments." (Emphasis omitted.) Id. The majority further asserts that the city's admission that the overpayments were collected on its behalf "does not necessarily mean . . . that the [city] actually . . . benefited from [those payments]," or that the money "actually ended up in the [city's] coffers . . . ." Footnote 15 of the majority opinion. As I previously indicated, however, at oral argument before this court, counsel for the city expressly acknowledged that the city *did* benefit from the overpayments, which the city also conceded were required to be used to pay the city's creditors in accordance with the program that the city had established to facilitate the rehabilitation of its residential housing stock. This concession is hardly surprising because, as I discuss in this opinion, and as Judge Gruendel observed in his dissenting opinion in the Appellate Court, the evidence adduced at trial establishes that the city benefited from its loan program and that it was equitably liable for the defendant's losses with respect thereto. See *Hartford* v. *McKeever*, 139 Conn. App. 277, 297, 304–305, 55 A.3d 787 (2012) (*Gruendel, J.*, dissenting).

The majority also observes that the defendant and I have cited "[no] authority for the proposition that a trust beneficiary [such as the city] is deemed to have benefited from any action taken by the trustee in the name of the beneficiary that benefited the trustee . . . ." Footnote 15 of the majority opinion. In the city's pretrial statement regarding liability, as well as at oral argument before the trial court, the city argued that, as beneficiary of the trust, it was not liable for the trustee's mismanagement of the trust prior to July 19, 2001. Although the trial court did not directly address this claim in its memorandum of decision, it found "that the city as to its defenses has not proven them by a preponderance of the evidence, whether [it is] the Uniform Commercial Code *or any other defenses*." (Emphasis added.) In light of this clear and unambiguous finding, and without an articulation by the trial court in this regard, we can presume only that the trial court ultimately rejected the city's claim that it was not liable for the overpayments that the trustee collected, regardless of what the trial court may have said in passing with respect to this issue while the trial was ongoing. Furthermore, on appeal to the Appellate Court, the city did not claim that the trial court incorrectly had concluded or had failed to address its claim that it was not liable for overpayments collected by the trustee, nor does it raise such a claim before this court as an alternative ground for affirming the judgment of the Appellate Court. In light of this procedural history, it is apparent that the city has abandoned any claim that it might otherwise have had with respect to the legal ramifications of its relationship to the trustees.

[5] With respect to its claim that it was not responsible for overpayments that occurred prior to the assignment, the city relied on a line of cases holding that an assignee is not responsible for the conduct of the assignor unless it expressly assumes liability as part of the assignment. All of those cases, however, involved an innocent assignee of a contract involved in an arm's-length transaction with the assignor, not an assignee who admitted that it, rather than the assignor, was the real party in interest all along. The city also argued that it could not be held liable because the CDC, rather than the city, actually serviced the loans.

[6] As I previously indicated, the majority states that it is "inexplicable" that the city would admit that it was a party to the original notes and mortgages "in light of the uncontroverted evidence that the promissory notes named the [CDC] as the payee." Footnote 14 of the majority opinion. As the city explained, however, when the defendant entered into the underlying transactions with the city as part of the city's redevelopment initiative, the use of municipal revenue bonds to fund such projects was subject to certain rules and restrictions, one of which was that the city must have a third party execute and administer the loans.

[7] "Courts of equity have original jurisdiction to state and settle accounts, or to compel an accounting, [when] a fiduciary relationship exists between the parties and [one of the parties] has a duty to render an account. The right to compel an account in equity exists not only in the case of those relationships [that] are traditionally regarded as those of trust and confidence, but also in those informal relations [that] exist whenever one person trusts in, and relies [on], another. The relationship between . . . parties to a business agreement . . . [has] . . . been deemed to involve such confidence and trust so as to entitle one of the parties to an accounting in equity." (Internal quotation marks omitted.) *Mankert* v. *Elmatco Products, Inc.*, 84 Conn. App. 456, 460–61, 854 A.2d 766, cert. denied, 271 Conn. 925, 859 A.2d

580 (2004).

<sup>8</sup> The majority cites *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 164, 84 A.3d 840 (2014) (*Blumberg*), for the proposition that "[t]he Appellate Court was not required to review an alternative ground for affirmance that the defendant had not distinctly raised and the trial court had not directly addressed, especially when the record was inadequate for review of the claim because the trial court had not made the requisite factual findings." Text accompanying footnote 17 of the majority opinion. *Blumberg*, however, involved an alternative ground for affirmance that the appellees raised for the first time on appeal; see *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 127; not, as in the present case, a claim that was raised in the trial court but that the court did not reach because it already had decided the case in favor of the prevailing party and there thus was no reason to reach alternative grounds on which that party also could prevail. Under the majority's reasoning, a party that prevails in the trial court on one ground would be required to seek to have the court rule in his or her favor on any and all other grounds. Even if the prevailing party sought such a ruling, however, there is no reason to think that a trial court would entertain such a request.

————————————————